MOBILE DELIVERY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7124. Promulgated November 5, 1927.

The amounts involved herein distributed by the petitioner to its stockholders during the years 1918 to 1922, inclusive, *held* to be part of the purchase price of ice delivered to the petitioner by the stockholders, and not dividends.

*Wm. S. Pritchard, Esq.,* for the petitioner.
*M. N. Fisher, Esq.,* for the respondent.

This proceeding is for the redetermination of deficiencies in income and profits taxes for the years 1918, 1919, 1920, 1921, and 1922, inclusive, in the total amount of $290,013.71. The issue is whether the income upon which the deficiencies are based belonged to the petitioner or to four other companies which owned all of its capital stock.

### FINDINGS OF FACT.

The petitioner is an Alabama corporation with its principal office and place of business at Mobile. It was during the years 1918 to 1922, inclusive, engaged in the business of selling ice at retail.

For a number of years prior to April 19, 1916, the Weinacker Ice & Fuel Co., a corporation, the Mobile Brewery, a corporation, the City Ice Co., a corporation, and the Southern Ice & Fuel Co., a partnership, were competitors, separately engaged in the business of manufacturing and selling ice at Mobile. They maintained separate sales and delivery systems and equipment and covered the same retail delivery routes each day. Often the wagons of the four companies were seen delivering ice in the same block at the same time.

In the early part of the year 1916 the business of manufacturing and selling ice was not profitable, and, at the suggestion of the president of a bank with which some of the companies dealt, a conference was held by and between the officers and managing agents of the four companies mentioned for the purpose of effecting economies in the business. At this conference it was agreed, after considerable discussion, that the four companies would organize a corporation to take over their delivery equipment and act as a consolidated sales agency for them. The four companies were to receive stock in the new corporation in proportion to their producing capacity and were to deliver ice to it in the same proportion—the corporation to make an initial payment of $2 per ton for all ice delivered and to distribute the remainder of the proceeds from sales, after deducting selling expenses, among the four corporations according to their respective stockholdings, such distribution to be additional payments for ice furnished by them. On April 19, 1916, in order to carry out the agreement reached at the conference, the following written contract was entered into by and between the four companies:

STATE OF ALABAMA,
  *Mobile County.*

WHEREAS, the undersigned parties are engaged in the manufacture of ice in the City of Mobile, Alabama, and each of the said parties maintains its own teams, delivery wagons and trucks for the delivery of ice throughout the City of Mobile and its vicinity; and,

WHEREAS, by following such course it is necessary for each of the parties hereto to keep up and maintain an expensive plant or establishment for making such deliveries; and,

WHEREAS, by forming a delivery company, as hereinafter provided, a large part of the expense incurred by each of the said parties in maintaining a separate plant for the delivery of its ice can be saved:

Now, THEREFORE, THIS INSTRUMENT, WITNESSETH, an agreement this day entered into by and between Weinacker Ice and Fuel Company, a corporation, hereinafter called Weinacker Company, William D. Martin, doing business under the firm name and style of Southern Ice and Fuel Company, hereinafter called

Southern Company, Mobile Brewery, a corporation, and City Ice Company, a corporation, wherein and whereby the parties hereto, in consideration of the premises and the mutual promises herein contained, do agree each with the other as follows:

Promptly after the execution of this agreement the parties hereto shall organize a corporation to be known as "Mobile Delivery Company," with a total authorized capital stock of $20,000, all of which shall be fully paid for, divided into two hundred (200) shares of the par value of $100 each, the Weinacker Company hereby agreeing to subscribe for 46 shares of the capital stock of said corporation, the Southern Company for 51⅓ shares, the Mobile Brewery for 51⅓ shares, and the City Ice Company for 51⅓ shares. Each of the said subscribers shall reserve the right to discharge their subscription to the capital stock of the said Mobile Delivery Company by conveying to the said company such part of the mules, horses, wagons and trucks which are now used by the said respective parties in the delivery of ice in Mobile County, Alabama, as taken at its fair value is reasonably worth the amount of the respective stock subscriptions hereinabove provided to be made by each of the said parties. Should the parties hereto so desire, the said corporation may be formed by such other persons as they may direct, and certificates of stock issued to such other persons shall be forthwith transferred on the books of the said corporation to the parties hereto so that their holdings in the stock of the said corporation shall be in the proportions hereinabove provided. The said Mobile Delivery Company shall have four directors, one of the said directors being selected from among the officers of each of the four parties hereto. The by-laws of the said Mobile Delivery Company shall particularly provide that the entire management of the Company shall be vested in the Board of Directors and shall provide for a meeting of the Board of Directors for a period of one hour each working day except when the Board of Directors should deem it unnecessary to hold such frequent meetings. The said by-laws shall further provide that the term of the President of said corporation shall be for one month, and it is agreed between the parties hereto that some officer of each of said parties, in rotation, shall hold the same office of President, it being further agreed that some officer of the Mobile Brewery shall be President for the first month, an officer of the City Ice Company for the second month, an officer of the Weinacker Ice and Fuel Company for the third month, and an officer of the Southern Ice & Fuel Company for the fourth month, and continuing thus in rotation, it being contemplated and agreed that no President shall hold office for more than one month consecutively, and that an officer of each of the parties hereto shall hold the Presidency of said Mobile Delivery Company for one month out of every four months.

The parties hereto agree to deliver their entire output of ice to the said Mobile Delivery Company for a period of four years from this date, unless the said Mobile Delivery Company should be dissolved before the expiration of such time, it being agreed and understood that this contract shall be in full force and effect for such period of four years.

Beginning immediately after the formation of the Mobile Delivery Company, The Weinacker Company shall commence to manufacture ice, and shall each day manufacture such amount not exceeding ninety tons per day as may be necessary to supply the demands of the said Mobile Delivery Company. The said Weinacker Company shall continue to operate its ice plant until it has furnished to the said Mobile Delivery Company a total of 6,900 tons of ice, and it shall then cease operations until such time as it shall begin to deliver ice to the said Mobile Delivery Company as hereinafter provided. As soon as

the demand for ice has reached that stage where the said Weinacker Company is unable to supply the demand, or as soon as the demand of the said Mobile Delivery Company for ice is more than the output of the said Weinacker Company, the said Southern Company shall commence to manufacture ice and shall each day furnish to the Mobile Delivery Company such amount as may be necessary to make up the total demand of the said Mobile Delivery Company after deducting therefrom the ice delivered to said Mobile Delivery Company by the said Weinacker Company. The said Southern Company shall continue to furnish ice to the said Mobile Delivery Company until it has furnished a total of 15,400 tons and shall then cease making ice until it shall resume operations as hereinafter provided. When the said Southern Company has delivered to the said Mobile Delivery Company, a total of 15,400 tons, or whenever the demand of the said Mobile Delivery Company for ice exceeds the amount which it is to receive from the said Weinacker Company and the said Southern Company, as hereinabove provided, then the Mobile Brewery shall commence to manufacture ice for said Mobile Delivery Company, and shall continue delivery to the said Mobile Delivery Company such amount of ice each day as, taken together with the output of the Weinacker Company and the Southern Company, may be necessary to make up the total demand for ice of the said Mobile Delivery Company. The said Mobile Brewery shall continue manufacturing and delivering ice to the said Mobile Delivery Company until such time as it has delivered a total of 15,400 tons of ice to the said Mobile Delivery Company, and it shall then cease to manufacture ice until it shall resume operations as hereinafter provided.

When the said Mobile Brewery has delivered to the said Mobile Delivery Company a total of 15,400 tons of ice, or whenever the demand of the said Mobile Delivery Company for ice exceeds the amount which it is to receive from the said Weinacker Company, the said Southern Company and the said Mobile Brewery, as hereinabove provided, then the City Ice Company shall commence to manufacture ice for said Mobile Delivery Company, and shall continue delivering to the said Mobile Delivery Company such amount of ice each day as, taken together with the output of the other parties, as hereinabove provided, may be necessary to make up the total demand for ice of the said Mobile Delivery Company. The said City Ice Company shall continue manufacturing and delivering ice to the said Mobile Delivery Company until such time as it has delivered a total of 15,400 tons of ice to the said Mobile Delivery Company, and it shall then cease to manufacture ice until it shall resume operations as hereinafter provided.

When the said City Ice Company has delivered to the said Mobile Delivery Company a total of 15,400 tons of ice, or whenever the demand of the said Mobile Delivery Company for ice exceeds the amount which it is to receive from the other parties hereto, as hereinabove provided, then the said Weinacker Company shall resume the manufacture of ice for the said Mobile Delivery Company, and shall continue delivering to the said Mobile Delivery Company such amount of ice each day as, taken together with the output of the other parties hereto, as hereinabove provided, may be necessary to make up the total demand for ice of the said Mobile Delivery Company. The said Weinacker Company shall continue manufacturing and delivering ice to the said Mobile Delivery Company until such time as it has delivered 6,900 tons of ice to the said Mobile Delivery Company, in addition to the 6,900 tons of ice which it is to deliver *immediately after the commencement of operations hereunder, as* hereinabove provided, making a total of 13,800 tons of ice. When the said Weinacker Company has delivered this additional 6,900 tons of ice, it shall

11340°—28——80

cease to manufacture ice until it shall resume operations as hereinafter provided.

It is contemplated between the parties hereto that in making deliveries of ice to the Mobile Delivery Company under this agreement, the Weinacker Company will deliver 13,800 tons of ice to every 15,400 tons of ice delivered by each of the other parties hereto, and when the amount of ice as hereinabove provided has been delivered, the parties hereto shall continue delivering ice to the said Mobile Delivery Company in the same manner, and in the same amounts, and on the same terms, as hereinabove provided for each, it being contemplated that the deliveries hereinabove specifically provided for will take approximately one year, except that for the second year the Southern Ice & Fuel Company shall first deliver one-half of its annual output of approximately 15,400 tons at the beginning of the season, and the remaining half at the end of the season, the deliveries being the same as during the first year with the exception that the Southern Ice & Fuel Company shall take the place of the said Weinacker Company, though the deliveries by the respective parties shall aggregate the same number of tons for the second year as for the first year. The deliveries of ice hereunder for the third year shall be the same as for the first year, with the exception that the Mobile Brewery shall take the place of the said Weinacker Company and deliver one-half of its annual production at the beginning of the season and one-half at the end of the season. For the fourth year, the deliveries of ice hereunder shall be the same as for the first year, with the exception that the said City Ice Company shall take the place of the said Weinacker Company and deliver one-half of its annual production at the beginning of the season and one-half at the end of the season. The schedule of deliveries shall be as follows:

| 1st year | 2nd year | 3rd year | 4th year |
|---|---|---|---|
| Weinacker (split) | Southern (split) | Brewery (split) | City (split) |
| Southern | Brewery | City | Weinacker |
| Brewery | City | Weinacker | Southern |
| City | Weinacker | Southern | Brewery |

It is expressly agreed and understood that the parties hereto shall only operate their ice plants during the periods as hereinabove provided, so long as this contract is in force, and shall only manufacture such ice as is delivered under the terms hereof to the said Mobile Delivery Company. It is also further expressly agreed that at no time shall the said Weinacker Company manufacture more than 90 tons of ice per day, nor shall any of the other parties hereto manufacture more than 100 tons of ice per day, unless such further manufacture is expressly requested, in writing, by the Board of Directors of said Mobile Delivery Company.

It is expressly stipulated and agreed that all of the deliveries to the said Mobile Delivery Company hereinabove provided to be made by the parties hereto, shall be made to the store rooms of the respective plants conducted by the parties hereto, it being understood that such deliveries shall be for the account of the said Mobile Delivery Company, and it being contemplated that the said Mobile Delivery Company will call for and receive the said ice at the store rooms of the respective parties. The store rooms of each of said parties shall be used by, and be under the control of, said Mobile Delivery Company, and all expense of labor for handling ice shall be borne by the said Mobile Delivery Company.

It is further agreed that Mr. Henry A. Horst will be elected Secretary and Treasurer of the said Mobile Delivery Company for a period of one year, and from time to time thereafter should the Board of Directors of the said Mobile

Delivery Company see fit to re-elect him, and that his salary shall be $1.0 per month. Mr. Walter P. Martin shall be elected auditor of the said delivery company for a period of one year, and from time to time thereafter should the Board of Directors see fit to re-elect him, and his salary shall be $150 per month. Mr. John B. Cronin shall be elected Superintendent of the Mobile Delivery Company for a period of one year, and from time to time thereafter should the Board of Directors of the said Mobile Delivery Company see fit to re-elect him, and shall have general charge of the receiving and delivering of ice under the terms of this contract, and his salary shall be $200 per month. Mr. C. J. Weinacker shall be elected Assistant Superintendent of said Mobile Delivery Company for a period of one year, and from time to time thereafter should the Board of Directors of said Mobile Delivery Company see fit to re-elect him, and his salary shall be $100 per month.

The Mobile Delivery Company shall pay to each of the parties hereto $2 per ton for each and every ton of ice furnished to the said Mobile Delivery Company by the parties hereto under the terms of this agreement, such amount to be paid weekly on Tuesday of each week for all ice delivered to said Mobile Delivery Company during the preceding week, provided the treasury of the said Mobile Delivery Company is in shape for making such payments, and in event there is not sufficient amount of cash on hand to make such payments each Tuesday, the said Mobile Delivery Company, shall, each Tuesday pay over to the respective parties hereto, pro-rata according to the amount of ice furnished by them the amount of cash then on hand, with the exception of such part of the said cash as it may be necessary for the said Mobile Delivery Company to retain for office and other expenses.

Whenever the Board of Directors is of the opinion that one of the above named ice manufacturing companies which is then enjoying the privilege of running up to the maximum capacity hereinabove allowed to it will not furnish sufficient ice for the purposes of the Delivery Company, the said Board of Directors may order the manufacturing company which then has the second right to manufacture to hold itself in readiness to begin such manufacture and to in fact manufacture such amount of ice as may be needed, and to this end such second company may be ordered to keep its tanks frozen down, and the delivery company shall pay the loss and expenses of so doing, such loss and expenses, however, to include only the following items, namely: The salary and wages of engineers and other necessary employees, the expense of ammonia, fuel and lubricating oil. No other expenses of any other kind or character shall be allowed or paid by the Delivery Company. However, the expenses so allowed shall be the same amount per ton to each of the said four plants.

Whenever the Board of Directors is of the opinion that it is no longer necessary to maintain a plant so frozen down, it shall order the owner of that plant to strip it, and the making company shall take and accept the agreed price for the ice drawn in so stripping the plant.

The word "ton" wherever the same is hereinabove used, shall be understood as meaning 2,000 pounds.

All ice furnished to the said Delivery Company shall be of a merchantable quality, and in case of any dispute the Board of Directors of said Delivery Company shall be the arbiters.

Should there be a tie vote, in the Board of Directors, on any proposition, the said Board shall call in an umpire and his decision shall be final.

In case of the destruction by fire of the plant of any of the parties hereto, the same must be rebuilt by the owner within six months from such destruction.

Each of the parties hereto will pay the Mobile Delivery Company for their respective tickets redeemed by the Mobile Delivery Company at the general rate fixed by the Board of Directors of said Delivery Company.

Some time subsequent to April 19, 1916, the initial payment of $2 per ton was, on account of the increased cost of labor and fuel, changed to $3.40 per ton. These initial payments were not intended to be in full payment for ice delivered, but were cash advancements to enable the weaker companies to operate.

Pursuant to the agreement made by the four companies the petitioner was incorporated on or about April 17, 1916, with a capital stock of $20,000, divided into 200 shares of the par value of $100 each. The capital stock was issued to an officer of the Weinacker Ice & Fuel Co., an officer of the City Ice & Fuel Co., an officer of the Mobile Brewery, and to W. D. Martin of the Southern Ice & Fuel Co., as trustees for the several companies, in the amounts of 46 shares, 51⅓ shares, 51⅓ shares, and 51⅓ shares respectively, and each of the companies paid into the petitioner delivery equipment equal in value to the par value of the stock received by it. No stock was issued for cash and none was ever transferred or sold from the date the petitioner was organized through the years involved herein.

Ice was delivered to the petitioner during the years 1916 to 1922, inclusive, by the four companies mentioned, for which they were paid the initial payment provided for, and, after the ice had been sold by the petitioner and expenses of sales and delivery paid, the balance of the proceeds was distributed to the four companies in proportion to their stockholdings in the petitioner. These distributions were made weekly during the summer months and at less frequent intervals during the winter. All money in the hands of the petitioner was deposited in banks and could be drawn but only by checks signed by all four of its directors. Deliveries of ice were not made by the companies during the years 1916 to 1922, inclusive, in exact proportion to their stockholdings in the petitioner and the requirements of the contract of April 19, 1916, and this disproportion in delivery was never adjusted either by additional deliveries or by changing the distributions to conform to the amounts of ice actually delivered. The tonnage of ice delivered by any of the four companies did not for the seven years mentioned vary more than 2½ per cent from its requirements under the contract.

During the year 1916 and until June, 1917, the distributions mentioned were denominated " dividends " in the minutes of the petitioner board of directors and they were so denominated and reported in the petitioner's income-tax return of 1916. However, in the early part of 1917 the petitioner's book-keeper was advised that it was not the intention of the petitioner to pay any dividends; that the distributions made to the stockholders were additional payments for ice, and that they had

been wrongly denominated in the minutes of the board of directors and in the income-tax return for 1916. No dividend was ever declared by the petitioner, and its stockholders at all times considered the distributions mentioned as additional payments for ice delivered by them to the petitioner, and they were so entered on their books and treated for purposes of taxation.

The cost of manufacturing the ice delivered to the petitioner during the years 1916 to 1922, inclusive, was in excess of $2 per ton and in several of those years was more than $3.50 per ton.

The petitioner in its income and profits-tax returns for the years 1918 to 1922, inclusive, treated the payments made to its stockholders, as above set forth, as part of the purchase price of ice delivered by them, and deducted the amount thereof as part of the cost of ice sold. The respondent determined that the distributions were not part of the cost of ice delivered to the petitioner, but that they were income to the petitioner and dividends to the stockholders, and he asserted deficiencies in tax in the amounts of $85,346.89 for 1918, $79,151.60 for 1919, $56,095.10 for 1920, $62,168.72 for 1921, and $7,251.40 for 1922.

OPINION.

MARQUETTE: This controversy particularly involves the payments made by the petitioner to its four stockholders in excess of the amount of $2 or $3.50 per ton specifically paid them for ice delivered under the original contract of April 19, 1916, and the contract as modified. The petitioner contends that the payments of $2 or $3.50 per ton were not intended to be in full payment for ice delivered by the stockholders, but were merely advances to assist the stockholders in taking care of their operating expenses, and that the remainder of the proceeds realized from the sale of ice, less selling costs, belonged to the stockholders as additional payments for ice furnished by them. It is the contention of the respondent that the payments of $2 or $3.50 per ton were and were intended to be the purchase price of the ice delivered by the stockholders and that the other payments or distributions represented earnings and income of the petitioner and dividends to the stockholders.

The evidence presented at the hearing is voluminous, and it is not necessary to set it forth in detail here. The material part thereof, briefly summarized, shows that prior to April, 1916, the four companies that constitute the petitioner's stockholders were competing in the manufacture and sale of ice at Mobile, each maintaining separate sales and delivery equipment. The ice business was at that time in an unprofitable state and at the suggestion of a banker with whom some of the companies dealt, their representatives held a conference to devise means of effecting economies in the business.

It was finally agreed that they would form a consolidated sales agency to handle the output of the four companies, thus obviating the duplication of sales and delivery equipment. At first it was not thought that it would be necessary to form a corporation, but some of the persons interested were distrustful of the others, and the question of management and liability for accidents arose, as well as the question of bringing suits to collect accounts, and it was decided that the delivery company should be incorporated, the capital stock thereof to be allotted to the four manufacturing companies in proportion to their producing capacity and to be paid for with delivery equipment equal in value to the par value of the stock. It was also suggested that the manufacturing companies deliver their output to the delivery company without receiving any advance payment, but, as some of the weaker companies needed money to take care of their operating expenses, it was finally agreed that the delivery company would make an advance payment of $2 per ton, subsequently changed to $3.50 per ton, and that the balance of the proceeds from sales after deducting the cost of selling would be distributed among the stockholders in proportion to the stockholdings and deliveries of ice, it being intended that stockholdings and deliveries should be in the same ratio. On April 19, 1916, the written contract set forth in the findings of fact was executed by the four companies for the purpose of carrying the oral understanding or agreement into effect. At or about the same time the petitioner was incorporated with a capital stock of $20,000, which was distributed among the four companies, in exchange for delivery equipment equal in value to the par value of the stock and in proportion to their producing capacity and the amounts of ice they were to deliver to the petitioner under the contract. The petitioner handled from the time it was organized the entire output of the four manufacturing companies, and paid them the specific amount per ton provided by the contract, and also distributed to them at intervals, usually weekly in the summer months and less frequently in the winter, all the proceeds from sales, less selling costs. These distributions were not made in the exact proportions in which the companies were required to deliver ice under the contract, which was also in proportion to their stockholdings in the petitioner, but were made regardless of whether the full quota had been delivered.

The respondent urges that as the distributions were always in proportion to the stockholdings and not in exact proportion to actual deliveries of ice they show that they were dividends and not payments for ice. We do not however think that fact is necessarily controlling, It is true that the distributions were exactly in proportion to the stockholdings, but they in turn were in the same proportions as the

amounts of ice the stockholders were to deliver to the petitioner under the contract, and it was, as the evidence shows, the capacity of the several plants and the amounts of ice to be delivered that determined the interests the four companies were allotted in the petitioner. By the contract it was provided that, in order to obviate the operating all of the plants concurrently, each plant should operate part time until they had produced their proportionate amounts. It was therefore obviously impossible that at all times the production of the four plants would be in the proportions contemplated by the contract, but it was intended that it would be equalized over the period of the ice year which began on April 1 of the calendar year. We do not attach any particular importance to the fact that over the years involved herein there was some disproportion in deliveries which was never equalized. It simply results in the fact that over a period of years, despite the intent of the contract, one or more of the companies received, in the practical carrying out of the contract, a little more and the others a little less for their ice than was contemplated.

The respondent also urges that the petitioner treated the distributions in question as " dividend " on the minutes of the meetings of the board of directors, and in its income-tax return for 1916, and that they were in fact dividends. The evidence however shows that they were so treated by the petitioner's bookkeeper and treasurer, and that shortly after the close of the year 1916 he was informed by the stockholders that such treatment was erroneous; that the petitioner had not made any dividend; that the intention and purpose of the agreement was that any money over and above expenses of delivery and the initial payment of $2 per ton was an additional payment for ice, and entered into the ice purchase accounts on the petitioner's books.

It is also contended by the respondent that if we give to the contract of April 19, 1916, the construction contended for by the petitioner it would be in violation of the anti-trust laws of Alabama. In our opinion that question has no bearing on this case. Conceding, for the purpose of this opinion only, that in making the contract of April 19, 1916, and in forming the petitioner corporation the four manufacturing companies did so in contravention of law, it can not change the fact that the petitioner engaged in business for a number of years, or transform into dividends payments actually intended and made for ice furnished it. Furthermore we are unable to perceive how it would be any the less a violation of law for the several companies to control the petitioner and receive its profit as dividends than for them to sell it their product in the manner in which they did.

The respondent also points out that the petitioner was not a party to the contract of April 19, 1916, and that we should attach no importance to it. That argument presents no difficulties. It is suffi-

cient to say that the petitioner was a creature of the four companies that organized it pursuant to the contract, and that it was in fact, if not in law, as firmly bound and controlled by the contract as if it had been a party thereto.

In the light of the evidence in this proceeding we are impelled to the conclusion that the petitioner was organized, not as a corporation to engage in business independently for the purpose of profit, but that it was and was intended to be a selling agency for the four companies which owned its capital stock, and that all proceeds from sales in excess of the initial payments for ice and the cost of selling were additional payments for ice, as contended by the petitioner. The contract is clearly susceptible of that construction and has at all times been so construed by the parties thereto.

Reviewed by the Board.

> *Judgment will be entered on 15 days' notice, under Rule 50.*